**In re Alfonso N. PEARSON,**
**Respondent.**

**A Member of the Bar of the**
**District of Columbia.**

**No. 91–SP–565.**

District of Columbia Court of Appeals.

Submitted May 4, 1992.
Decided July 15, 1993.

Before ROGERS, Chief Judge, and FARRELL, Associate Judge, and REILLY, Senior Judge.

REILLY, Senior Judge:

Having been notified that respondent, Pearson, recently disbarred from practice in Maryland by the Court of Appeals of that state, is also a member of the bar of this jurisdiction, the Board on Professional Responsibility, after reviewing the Maryland proceedings has recommended that our court should order him disbarred in the District of Columbia—a recommendation also supported in a statement to the Board by Bar Counsel. As the ground for disbarment had nothing to do with any act which occurred in the District, our disposition of such recommendation is governed by D.C. Bar R. XI, § 11, entitled "Reciprocal discipline."

In its report, the Board stated that although given an opportunity to respond to Bar Counsel, respondent never did so. The record discloses that he neither entered an appearance nor filed any brief when the report was referred to this court. Thus in its present posture the case before us is uncontested. Section 11(c) requires that "[r]eciprocal discipline shall be imposed *unless the attorney demonstrates, by clear and convincing evidence*" that certain enumerated exceptions apply to his case. (Emphasis supplied.)[1] As this subsection places the burden of proof in defending against an identical sanction upon the lawyer affected, it seems to suggest that in the absence of any defense, this court must automatically apply whatever discipline had been imposed elsewhere. *See In re Trilling*, No. 88-256 (D.C. March 8, 1989), citing *In re Sinclair*, 517 A.2d 309 (D.C.1986).

We have some difficulty in applying this rule to the instant case, however, for our opinion in both those cases noted that the respondent lawyers were aware of the reciprocal proceedings here, but elected not to present any defense. In contrast, the record certified to us does not conclusively establish that the respondent here was ever actually served with notice of the proceedings against him in this jurisdiction.[2] Therefore, we have decided to examine the record of the disciplinary court to determine whether the imposition of identical discipline is in order, for another provision in the rules—not easy to reconcile with subsection (c), set forth in note 1, *supra*—authorizes this court, *sua sponte*, to make such a determination. We refer to subsection (f) which reads:

> The Court shall impose the identical discipline unless the attorney demonstrates, *or the Court finds on the face of the record* on which the discipline is predicated, by clear and convincing evidence, that one or more of the grounds set forth in subsection (b) of this section exists. If the Court determines that the identical discipline should not be imposed, it shall enter such order as it deems appropriate, including referral of

---

1. Insofar as relevant, this subsection provides:

   (c) *Standards for reciprocal discipline.* Reciprocal discipline shall be imposed unless the attorney demonstrates, by clear and convincing evidence, that:
   (1) The procedure elsewhere was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or
   (2) There was such infirmity of proof establishing the misconduct as to give rise to the clear conviction that the Court could not, consistently with its duty, accept as final the conclusion on that subject; or
   (3) The imposition of the same discipline by the Court would result in grave injustice; or
   (4) The misconduct established warrants substantially different discipline in the District of Columbia; or
   (5) The misconduct elsewhere does not constitute misconduct in the District of Columbia.

2. We have no doubt that the staff of the Bar Counsel and the Board attempted by mail to notify respondent of the complaint and proceedings against him, for the record contains copies of letters addressed to him at a post office box number in Burnwell, Alabama, the same address used by the Clerk of the Maryland Court of Appeals in forwarding the disbarment order to him. It appears from the Maryland record, however, that during the pendency of the proceedings there, respondent had abandoned addresses at five different locations, including two in Georgia, and that Maryland bar counsel had to use the telephone to reach him in Alabama and make sure that he was aware of various documents he sought to serve upon him. The local District of Columbia record, however, contains no postal return receipts, so we are not sure he ever received the letters or copies of other notices posted by Bar Counsel or the Board. No service of process was apparently ever attempted.

the matter to the Board for its further consideration and recommendation. [Emphasis supplied.]

In view of our holding in *In re Williams*, 464 A.2d 115 (D.C.1983), we are concerned, as was Bar Counsel and the Board itself, as to whether the final action of the Maryland Court of Appeals was based on evidence of wrongdoing or was simply an affirmation of a default judgment. As its opinion reveals on its face that the latter was precisely what that court did, we reject the crucial findings and recommendation of our Board.

## I.

From the Maryland record we glean these undisputed facts: Respondent Pearson, a Maryland practitioner, and his wife, Lois Garrison, the parents of adult sons, were divorced in 1984 in Anne Arundel County. The divorce decree approved a settlement of all items of marital property, with one exception, viz., a parcel of improved land in Berkeley County, West Virginia, purchased in 1977, and jointly owned by husband and wife. In 1988, the husband—who had moved to Georgia and was married to another woman (Gloria)—arranged for a Berkeley County real estate broker to list the land for sale. About three months later, one Alice Lyons, who needed a place to live in this particular vicinity, submitted a bid of $20,000 which was accepted. A power of attorney was drafted by a settlement attorney, a disclaimer of mechanics liens, and a deed conveying the property to the purchaser was forwarded to Pearson in Georgia. These documents required notarization by both owners. Lois Pearson did not come to Georgia to sign these instruments, but Pearson representing to the notary public that he was authorized to do so, signed his former wife's name as well as his own to these documents.[3]

With these instruments in his possession, David Pill, the designated settlement attorney, arranged for closing on July 13, 1988. Neither owner was present. The check for $20,000 from Alice Lyons was received and cashed, $13,000 of which was used to pay off the balance of a mortgage note held by a local bank. This enabled the settlement attorney to convey the land to Ms. Lyons free and clear of encumbrances, and to draw and send a check to Pearson in the amount of $7,000, the net proceeds of the sale.[4] On the very next day, the settlement attorney having been told by Lois Pearson that the signature on the instruments was not hers, notified both the purchaser and the mortgagee that the sale was invalid. Pearson, confronted with this situation, agreed that all proceeds of the sale should go to his former wife. She and Pearson then executed corrective instruments which gave the purchaser clear title. A new check, drawn by Pill, representing all the proceeds due the sellers, designated Lois G. Pearson as the sole payee and was posted to her.

## II.

Pearson's troubles with the disciplinary authorities in Maryland began when Lois Pearson filed a complaint against him. He was then summoned to appear before an inquiry panel, "Attorney Grievance Commission." Pearson admitted the facts previously summarized, but testified that far from forging his former wife's signature in order to defraud her, that it was she who had insisted that the jointly held land be

---

**3.** According to his brief, the notary public, Malavese Doss, before placing her seal of acknowledgment on the instruments had received a telephone call from the co-owner directing her to certify her signature on the documents as genuine. Respondent was unable to get Ms. Voss to support his statement. He represented to the Maryland Court of Appeals that she had died. He did attach an affidavit from another Georgia notary public, who averred that while Pearson was in her office presumably to obtain notarization of the instruments, a Mrs. Garrison (Lois) had telephoned him, that he asked the notary to pick up the phone after talking with the caller but that the latter hung up. As this notary had not brought her seal to the office, she did not notarize the papers.

**4.** This particular check was never introduced at any stage of the Maryland proceedings, although Pearson averred in his brief that he had mailed it to his former wife. In any event, no payment on the check was ever made because of a "stop" order of the settlement attorney.

sold, and that because she was living in Maryland and he in Georgia at the time, she instructed him to affix her signature to whatever documents were essential to effectuate a sale.[5] Acting upon this authorization, he secured notarization of the instruments and posted them back to the settlement attorney. His adult son—a Maryland police officer—called as a witness, supported his father's testimony stating that in his presence his mother had indeed requested her former husband to do what he did.

According to Pearson's brief (filed in the Maryland Court of Appeals), he told the panel that he kept Lois Pearson informed overall and by mail of the progress of the sales negotiations and the preparation of the necessary instruments, and that she never expressed disagreement with any of his actions. He presented copies of his letters to support his version of the incident. He also testified that after the closing, he received a telephone call from Curtis J. Karpel, attorney for Lois Pearson, who told him, "Al, we got you by the balls...." Pearson responded by saying that he had permission to sign her name, whereupon his caller retorted that Pearson had nothing in writing from her, and that it would cost him $40,000 to have the transaction affirmed. Pearson refused and hung up the phone. Karpel then called back and said that unless Pearson would send him $30,000, he would advise his client to file a complaint. Accusing them of extortion, Pearson again turned down Karpel's proposition. In subsequent negotiations, Pearson offered to settle the matter by authorizing Karpel to direct Pill to draw a check in favor of Lois Pearson (after she had executed the corrective instruments) for all the proceeds received by the sellers. Pearson's second wife, who had overheard Karpel's calls to their home in Georgia, corrob-

orated Pearson's testimony about the attempted extortion.[6]

In its report recommending that charges be filed against Pearson, the inquiry panel made no attempt to resolve the conflict of testimony between the complainant and respondent. It deemed Pearson's admission that he had caused a notary public in Georgia to acknowledge the signature of Lois G. Pearson to an enumerated series of documents on occasions when she was not present and did not personally appear before the notary as sufficient to warrant findings that respondent had thereby violated D.C.Bar R. 8.4(a)(b)(c) and (d). It characterized such conduct as a "criminal act," "a representation amounting to dishonesty and deceit," and "prejudice to the administration of justice," because it did violence to the orderly transfer of property and maintenance of land records, but cited no authority to support such views.

Without so stating, the panel obviously concluded that even if Lois Pearson had specifically authorized respondent to sign her name to the documents and had refused to place her own signature on a power of attorney as part of a conspiracy with Karpel to extort a sizeable sum of money from him, such facts did not establish a valid defense to the charges. Hence the panel must have felt that it was not under any duty to make a finding with respect to the evidence supporting respondent's defense.

The Maryland Court of Appeals in affirming a default judgment by a circuit judge expressed quite a contrary view, stating *inter alia* that "[h]ad this matter proceeded to trial on the charges, it appears that Pearson would have had substantial ammunition for cross-examining Lois and her attorney, ... because it appears that [they] may have attempted to extract a $30,000 'settlement' from Pear-

---

5. Lois Pearson had previously testified that she had never authorized her former husband to place her signature on any of the conveyancing instruments or the sales contract to Lyons and knew nothing about the projected sale until after the actual closing. The panel admitted the documents into evidence.

6. Although a transcript of the panel inquiry hearing was in the possession of Maryland bar counsel, he refused to give a copy to Pearson, and it does not appear in the record certified to us by the Board. The foregoing summary is based on the panel's brief description of the testimony and Pearson's account of those proceedings. Neither are inconsistent.

son." The court also observed that "the demand could have followed a treacherous revocation of previous, orally granted authority in order to make it appear that Pearson was attempting to take Lois's money." Noting that she had attempted to withdraw her complaint, the court hypothesized that "[h]ad the case been tried, perhaps Pearson could have generated a sufficient doubt to prevent an adverse finding ... [but] had no one but himself to blame for the loss of that opportunity." [7]

Referring to the circuit court's decision to bar Pearson from presenting evidence in his own defense and striking his formal response—in the form of a twelve-page brief—the appellate court went on to say that Pearson's "indifference to required procedure and his evasiveness and inconsistency of critical facts bearing on the merits have produced the result that this case is presented to us for a disciplinary sanction for Pearson's having executed documents *without Lois's authority in order to obtain for himself the proceeds of the sale of the West Virginia property.* It follows that disbarment is the appropriate sanction for the violation of Rule 8.4 of the Rules of Professional Conduct." (Emphasis supplied.)

The opinion of the court began by stating, "In substance the issue before us is whether Pearson may be relieved from the default in order to have the charges decided" and later concluded, after reviewing the motions hearing before the circuit judge, that "a default under Rules 2–432(a) and 2–433(a) is appropriate" and that the judge had not abused his discretion in entering such a judgment.

Thus, it is clear from the text of its opinion that the highest Maryland court disbarred respondent—as our Bar Counsel correctly noted—for attempting to sell property by signing his former wife's name to the necessary documents (including a notarized deed) without her knowledge or authorization in an illegal effort to deprive her of her share of the proceeds. It is also clear that the decision sustaining this charge rested not on evidence, but on the ground that respondent by his belated and unsatisfactory responses to the discovery procedure prescribed under the Maryland disciplinary rules had forfeited his opportunity to present testimony refuting such charge.

Bar Counsel in urging our Board to recommend to us the acceptance of this decision and the imposition of identical discipline—disbarment—recognized that we have held that a default judgment based not on findings after an evidentiary hearing, but on failure to answer charges, provides no foundation for recommended disbarment. *In re Williams, supra.* He attempts to distinguish the *Williams* case, however, arguing that the Maryland decision is supported by evidence. According to Bar Counsel, "Here, witnesses testified under oath and subject to cross examination in preliminary proceedings. The default here was entered after notice to respondent and based upon his persistent failure to participate in the prehearing discovery process. Respondent appeared before the hearing judge against the default. The key documents were admitted in evidence. Respondent's *contentions as to the key disputed facts were considered and rejected. Due process requires no more.*" (Emphasis supplied.) The Board in its report agreed with this argument and concluded that *Williams* is not controlling here.[8]

---

7. The court might have added that Pearson's defense was also supported by evidence that his divorced wife had laid an ambush for him by requesting the mortgagee to notify her of any change in title. Unless one credits her with the gift of mental telepathy, she would have had no occasion to alert the mortgagee if her husband had not informed her about the instruments he was transmitting to the settlement attorney. Hence, the finding of the circuit judge that "Lois until after the closing was unaware of respondent's actions" is wholly lacking in evidentiary

support—for the judge had refused to hear evidence. In accepting this finding as a fact, the Maryland Court of Appeals held that it was based not only on default, but also upon respondent's failure to respond to a request for admission. *But see In re Williams, supra,* 464 A.2d at 119.

8. The Board cited *In re Trilling, supra,* as supporting its conclusion. As this was an unpublished decision, it cannot be invoked as controlling precedent, especially since our memoran-

In our opinion, the quoted summary of the Maryland record is misleading. The only body which heard evidence—the inquiry panel—neither "considered nor rejected" respondent's version of the "key disputed facts," viz., whether or not his former wife had authorized his placing her signature on the crucial documents. As we have pointed out, the panel ignored this evidentiary issue, basing its recommendation that formal charges be instituted, solely on the basis of admitted, not contested, facts. The Maryland Court of Appeals, as we have also noted, expressly disclaimed passing judgment on the factual issues raised by respondent's defense. Hence it appears that our Board, in accepting counsel's argument, overlooked the crucial aspect of the Maryland record, viz., that neither the trial judge nor the Maryland Court of Appeals ever found as a fact that respondent was guilty of forging his wife's name on the instruments of conveyance in order to cheat her out of her share of the proceeds.

We would agree, of course,—as our own rules contain the counterpart of Md.R. 8.4 [9]—that had respondent indeed been guilty of this charge, the identical discipline—disbarment from practice in the District of Columbia—would be appropriate. In the absence of such factual finding, we now turn to our own rules, *see* note 1, *supra,* to ascertain whether respondent's case falls within one of the exceptions to the application of reciprocal discipline. In the light of *In re Williams, supra,* we have concluded that even though the Maryland courts determined that respondent's answers to their own bar counsel's discovery requests were unsatisfactory, the imposition of such a severe sanction as forfeiture of a right to an evidentiary hearing, constituted a deprivation of due process under D.C.Bar R. XI, § 11(c)(1). We also

think that there was such "infirmity of proof establishing misconduct" that we should not accept as final the Maryland conclusion on that subject. *See* R. XI, § 11(c)(2), *supra* note 1. Moreover, it is unclear that respondent had notice of the proceedings in this jurisdiction. Hence, we decline to enter an order of disbarment.

*So ordered.*

FARRELL, Associate Judge, concurring.

I join the court in declining to order reciprocal disbarment. I do so, however, under the compulsion of *In re Williams,* 464 A.2d 115 (D.C.1983), which in an appropriate case I would vote to reconsider.

The issue before the Maryland Court of Appeals, as stated by that court, was "[i]n substance ... whether Pearson may be relieved from [a judgment of] default [and hence disbarment] in order to have the [disciplinary] charges decided on an evidentiary record." The default, in turn, had resulted from what the Court of Appeals concluded to be Pearson's indifference and evasiveness in responding to disciplinary discovery.

In *Williams, supra,* however, we effectively held that it would violate constitutional due process to disbar an attorney "on [a] default judgment[ ] unsupported by proof." *Id.* at 119. Our principal authority for so holding was *Klapprott v. United States,* 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266 (1949), which set aside a judgment by default in a naturalization proceeding. Bar Counsel seeks to distinguish *Williams* by pointing out that in this case ample proof of respondent's dishonest conduct was adduced before the Maryland inquiry panel. Upon careful review of the record, however, I agree with Judge Reilly that neither the inquiry panel nor Judge Lerner, in rul-

dum opinion affirming contains no reference whatsoever to the kind of evidence introduced at any stage of the Maryland proceedings.

**9.** Md.R. 8.4 Misconduct:

It is professional misconduct for a lawyer to: (a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice.
Except in one minor respect, the same language is found in the first four subdivisions of D.C.Bar R. 8.4.

ing on the motion for a default judgment, resolved upon that evidence the critical issue whether respondent had been authorized by his wife to sign the sale documents on her behalf. And, as noted, despite some ambiguous language in its opinion, the Maryland Court of Appeals framed the issue before it in terms of a default judgment and whether respondent had shown grounds for relief therefrom.[1] The disbarment in Maryland thus runs athwart our holding in *Williams*, and prevents reciprocal disbarment. *See* D.C.Bar R. XI, § 11(c)(1) (reciprocal discipline not permitted where disciplining state's procedure "constitute[s] a deprivation of due process"); § 11(c)(2) (same where "[t]here was such infirmity of proof establishing the misconduct as to give rise to the clear conviction that the Court could not, consistently with its duty, accept as final the conclusion on that subject").[2]

Were we writing on a clean slate, I could not agree that the Constitution prohibits a state from disbarring an attorney who in its judgment has engaged in a fundamental refusal to cooperate in the attorney disciplinary process. The denaturalization proceeding analogized to in *Williams* is decidedly inapposite to the conditional right which a state bestows upon an attorney to practice law in its jurisdiction. The practice of law remains a privilege, and our rules governing the Bar—presumably like Maryland's in this respect—provide that it is "misconduct" subject to "discipline" for a member of the Bar to "[f]ail[ ] to respond to a written inquiry from the Court or the Board [on Professional Responsibility] in the course of a disciplinary proceeding without asserting, in writing, the grounds for refusing to do so." D.C.Bar R. XI, § 2(b)(4). A failure to respond to disciplinary discovery flagrant and repeated enough would, in my view, allow a state constitutionally to cancel an attorney's license and require him or her to seek reinstatement (as in the District of Columbia) after a mandatory period of disbarment.

My colleagues assert that Maryland disbarred respondent because his "answers to [Maryland] bar counsel's discovery requests were unsatisfactory." *Ante* at 99. The unanimous Maryland Court of Appeals, as well as Judge Lerner, viewed respondent's failure to cooperate in discovery more gravely. Except for *Williams*, I would defer to Maryland's judgment that respondent's indifference to complying with the disciplinary process was severe enough to give rise to a fortunately rare case justifying disbarment for default.

I do not believe, however, that this is an appropriate case to reconsider *Williams'* flat prohibition of disbarment (even reciprocally) without a determination of actual misconduct. Respondent is elderly; and it does not appear from the record—which includes his failure to respond to the disciplinary proceedings in the District of Columbia at any time—that he has any intention of practicing law again in this jurisdiction. Indeed, judging from his evident failure to file any supplemental registration statements setting forth changes in address, *see* D.C.Bar R. II, § 2(1), it seems

---

1. The ambiguous language I refer to is the Court of Appeals' statement with regard to Judge Lerner's "finding of fact" that Mrs. Pearson was never aware of respondent's actions in signing her name until after the closing took place. The Court of Appeals stated:

   That is a finding ... based on the default. It is also a finding which is supported by proper inference from the requests for admissions of fact *which were admitted by failure to respond, without regard to the default for failure of discovery.* [Emphasis added.]

   In *Williams*, however, we said that any such admission by failure to respond, in order to be considered, must be "one giving weight to sworn evidence." 464 A.2d at 119. That is (apparently), such admissions may receive

weight only when combined with "sworn evidence" leading to a finding of misconduct sufficient to support disbarment. Otherwise, for the *Williams* court, reliance on admissions by failure to respond is just a sub-species of forbidden disbarment by default—the basic principle of *Williams* that I would reexamine.

2. The latter exception (§ 11(c)(2)) I take to be a variant of the "due process" bar to reciprocal discipline, else I can find no source for our "duty" to abandon the normal "deference—for its own sake—[which we give] to the opinions and actions of a sister jurisdiction with respect to attorneys over whom we share supervisory authority." *In re Velasquez,* 507 A.2d 145, 147 (D.C.1986).

doubtful that he qualifies for current membership in good standing in this Bar. *See* D.C.Bar R. II, §§ 2(3), 5. It is enough, therefore, for me to disassociate myself from the court's conclusion that respondent's disbarment "constituted a deprivation of due process," *ante* at 99. Even if *Williams* compels it, that conclusion is an unjustified deprecation of the judgment of our sister jurisdiction.